**In re Michael Evert LARSON, SS# 524–08–9301 and Michele Rae Larson, SS# 522–04–8065, Debtors.**

**No. 00–20711–SBB.**

United States Bankruptcy Court,
D. Colorado.

March 12, 2001.

Daniel A. Hepner, Boulder, CO, trustee.

## MEMORANDUM OPINION
## AND ORDER

SIDNEY B. BROOKS, Bankruptcy

Eric Carlson, Greeley, CO, for debtors. Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ..................................................180

II. ISSUES PRESENTED..............................................180
 A. State Exemption Issues .......................................180
 B. State and Federal Constitutional Law Issues ..................181

III. FACTS .........................................................182
 A. Debtors' Farming/Ranching Background ......................182
 B. Farmers Bank Debt..........................................183
 C. FSA Debt ..................................................183
 D. Debtors' Bankruptcy Case ...................................184

IV. DISCUSSION ....................................................186
 A. Burdens of Proof ...........................................186
 1. FSA's and Farmers Bank's Objection to Debtors' Claimed Exemptions.....186
 2. Debtors' Motions to Avoid Security Interests of FSA and Farmers' Bank ...................................................186
 B. Exemption Issues............................................186
 1. Debtors Are Engaged in Agriculture as Their Principal Occupation, so as to Permit the Use of the Exemption Found in Colo .Rev.Stat. § 13-54-102(1)(g) ........................................186
 2. Debtors' Equipment Does Qualify as "Stock in Trade, Supplies, Fixtures, Maps, Machines, Tools, Electronics, Equipment, Books, and Business Materials "of [the] Debtors" Which Is "Used and Kept for the Purpose of Carrying on Any Gainful Occupation" Pursuant to Colo.Rev.Stat. § 13-54-102(1)(i) ..................................188
 3. Farmers Bank's and the FSA's Liens in Remaining Livestock May be Avoided in Accordance with 11 U.S.C. § 522(f) and Colo.Rev.Stat. § 13-54-102(1)(g) as "Tools of the Trade" ......................189
 4. Debtors Can "Stack" the Exemptions Provided for Under Colo.Rev. Stat. §§ 13-54-102(1)(g) and (i) .........................................193
 5. Each Debtor Can Claim an Exemption Under Both Colo.Rev.Stat. §§ 13-54-102(1)(g) and 13-54-102(1)(i) ...................................193
 B. Constitutional Issues .......................................194
 1. Introduction to the State and Federal Constitutional Issues................194
 2. Overview of the Amendments to the Colorado Exemption Statute .........195
 a. Amendment to Colo.Rev.Stat. § 13-54-102(1)(g) .....................195
 b. Amendment to Colo.Rev.Stat. § 13-54-102(1)(i) .....................195
 3. Legislative Intent .........................................196
 4. Burdens and Presumptions in Analyzing the Amended Exemption Statute ......................................................197
 5. Exemptions under 11 U.S.C. § 522 ....................................197
 6. Constitutionality of 11 U.S.C. § 522(f) ...............................198
 7. Does the Amended Colorado Exemption Statute have Retroactive, Retrospective or Prospective Application? ..............................199
 a. Colorado Statutes are Presumed Prospective ........................199

 b. "Vested Rights" ............................................... 200
 c. Retroactive Application of the Statute to "Vested Rights" ............. 200
 8. The "Takings" Clauses of the United States Constitution and the Colorado Constitution ......................................... 201
 9. Application of the May 23, 2000 Amendments Does Not Violate the "Contracts" Clauses of the United States and Colorado Constitutions ..... 202
C. Concluding Comments Regarding the State and Federal Constitutionality Issues ....................................................... 203

V. CONCLUSION ................................................ 203

VI. ORDER ..................................................... 203

## I. *INTRODUCTION*

THIS MATTER comes before the Court on the following:

1. Objection to Debtors' Claimed Exemptions filed by Farmers Bank of Ault, Colorado ("Farmers Bank") and the Farm Services Agency of the United States Department of Agriculture (the "FSA"), (collectively referred to herein as "Creditors").

2. Debtors' Motion to Avoid Security Interest of Farm Services Agency in Exempt Property Under 11 U.S.C. § 522(f).

3. Debtors' Motion to Avoid Security Interest of Farmers Bank in Exempt Property Under 11 U.S.C. § 522(f).

The Court conducted an evidentiary hearing regarding the above matters on December 29, 2000. At the conclusion of testimony, evidence and arguments by counsel, the Court took the matter under advisement. The Court, however, permitted the parties to provide supplemental briefing on the constitutional issues raised by the parties. These briefs have been submitted and the Court, having reviewed the file, the pleadings, evidence before the Court and being otherwise duly advised in the premises, enters the following findings of fact, conclusions of law and order.

In brief, this Opinion deals with (1) the nature and extent of exemptions claimed by the Debtors, but objected to by the Creditors, (2) avoidance of the Creditors' liens on certain property, and (3) constitutionality of new, increased exemptions effective May 23, 2000, which are claimed by Debtors.

With regard to those issues, the Court concludes that (1) the Debtors' are entitled to claim the full extent of exemptions claimed by them, (2) the avoidance of certain lien claims is permissible under 11 U.S.C. § 522(f), and (3) the new, increased exemptions are constitutional.

## II. *ISSUES PRESENTED*

The facts of this case raise the following questions with regard to the Colorado exemption statute and the substantial revisions thereto, effective May 23, 2000.

### A. *State Exemption Issues*

As a preliminary matter, the parties have asked that this Court determine if certain of the Colorado exemptions claimed by the Debtors are even available to the Debtors under the specific facts of the case. The state exemption issues are as follows:

1. Are the Debtors engaged in agriculture as their principal occupation, so as to permit them to use the exemption found in CoLo.Rev.Stat. § 13–54–102(1)(g)? [1]

---

**1.** Reference to the exemption statute, unless otherwise noted herein, shall be to the current

2. Does certain of Debtors' agricultural equipment qualify as "stock in trade, supplies, fixtures, maps, machines, tools, electronics, equipment, books, and business materials ... used and kept for the purpose of carrying on any gainful occupation" pursuant to COLO.REV.STAT. § 13–54–102(1)(i)?

3. Does certain livestock of the Debtors qualify as "tools of the trade" under Colorado law and is, thus, exempt under COLO.REV.STAT. § 13–54–102(1)(g) and avoidable pursuant to 11 U.S.C. § 522(f)?

4. In the event that this Court determines that the Debtors are engaged in agriculture as their principal occupation, are the Debtors allowed to "stack" the exemptions provided for under COLO.REV.STAT. §§ 13–54–102(1)(g) and (i)?

5. In the event that this Court determines that (a) the Debtors are engaged in agriculture as their principal occupation, and (b) the Debtors are allowed to "stack" the exemptions provided for under COLO.REV. STAT. §§ 13–54–102(1)(g) and (i), then can *each* Debtor claim an exemption under both COLO.REV.STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i)?

The Court, as discussed below, finds that with regard to the state exemption issues:

1. The Debtors *are* engaged in agriculture as their principal occupation so as to permit the use of the exemption found in COLO.REV.STAT. § 13–54–102(1)(g).

2. Debtors' farming equipment does qualify for the exemption found in COLO.REV.STAT. § 13–54–102(1)(i) and

the liens are therefore avoidable under 11 U.S.C. § 522(f).

3. Debtors' livestock is exempt under COLO.REV.STAT. § 13–54–102(1)(g). Moreover, because the livestock held by the Debtors is "breeding stock," the livestock qualifies as a "tool of the trade" for the purposes of lien avoidance under 11 U.S.C. § 522(f).

4. The Debtors are allowed to "stack" the exemptions provided for under COLO.REV.STAT. §§ 13–54–102(1)(g) and (i).

5. Each Debtor can claim an exemption under both COLO.REV.STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i).

### B. *State and Federal Constitutional Law Issues*

In addition to issues regarding the applicability of the exemption statutes to these Debtors, the parties come to this Court for a determination as to whether the Colorado exemption statute, as amended effective May 23, 2000, as applied to the loans of the Creditors, violates the Colorado or United States Constitutions. The issues can be stated as follows:

Do the amended Colorado exemption limits, effective May 23, 2000, in conjunction with the lien avoidance provisions set forth in 11 U.S.C. § 522(f)(1)(B), (a) constitute a "retrospective" application of state law in violation of Colo. Const. art. II, § 2 and COLO.REV.STAT. § 2–4–202, (b) constitute an unconstitutional "taking" of the collateral to the loans held by Farmers Bank and/or the FSA under the Fifth Amendment to the United States Constitution and the Constitution of the State of Colorado, and/or (c) violate the respective "contracts" clauses of the

exemption statute in effect on and subsequent to May 23, 2000.

United States Constitution and the Constitution of the State of Colorado?

For the reasons more fully set forth below, this Court finds that:

The application of the amended Colorado exemption limits to the FSA's loan—a loan and security agreement which was entered into *prior* to the enactment of the amended exemption statute—concomitant with avoiding the Creditors' liens—does not (a) constitute a "retrospective" application of state law in violation of Colo. Const. art. II, § 2 and Colo.Rev.Stat. § 2–4–202, (b) constitute an unconstitutional "taking" of the collateral to the loans held by Farmers Bank and/or the FSA under the Fifth Amendment to the United States Constitution and the Constitution of the State of Colorado, and/or (c) violate the respective "contracts" clauses of the United States Constitution and the Constitution of the State of Colorado.

## III. *FACTS*

The underlying facts are largely undisputed. Furthermore, at the outset, and as a predicate for the findings below, this Court finds that the testimony of the Debtors at the evidentiary hearing was credible and persuasive.

### A. *Debtors' Farming/Ranching Background*

The unrefuted testimony of Debtor Michael Evert Larson ("Mr. Larson" herein) was that he has been involved in farming and ranching since 1971 and that his family has been in the farming and ranching business for four generations. It was his testimony that the Debtors have engaged in agriculture and/or ranching as their principal occupation from the mid to late–1970s to 1998. During this period the Debtors farmed as many as 1,400 acres of crops and maintained a herd of about 180 cattle.

Debtor Michele Rae Larson ("Mrs. Larson" herein) has been a farmer and rancher most of her life. As with Mr. Larson, her parents, grandparents and great-grandparents also were farmers and ranchers. Mrs. Larson grew up on a farm and started farming after she graduated from high school. Her duties in the Debtors' farming and ranching operations were substantial and multifaceted, and included, among other things, branding, feeding, watering and vaccinating the cattle, keeping the business's books and records, and operating machinery during the planting and harvesting seasons.

The testimony of the Debtors and that of Mr. Larson's father, further demonstrated that the children of the Debtors also helped in the farming operations. In particular, Kent Larson, Debtors' son, has been, and continues to be, very active and essential in the farming operations. In addition, the Debtors' two daughters, Samantha and Katie, help with the chores and assist in the care of the cattle.

In the 1990s the Debtors suffered several bad years of crops and incurred losses in their farming operations. Due to their financial hardships, Mr. Larson began trucking for the first time in 1998. In addition, Mrs. Larson, in 1999, obtained employment away from the farm. Initially, she cleaned houses in the area to supplement and help sustain the farming business. In an attempt to bring in more income to the family, in August of 1999, she started trucking. Her undisputed testimony—and that of her husband—is that she did not want to drive a truck to earn income, but due to the Debtors' financial condition and her limited education, this was about the only opportunity she had to make any significant additional income.

As of the date of the bankruptcy filing, September 11, 2000 (the "Petition Date" herein), both Debtors were actively involved in trucking, each working roughly 40 hours per week.[2] The Debtors owned no land on the date of filing but did own farming equipment and cattle. The farming equipment is located at Mr. Larson's father's farm and the cattle were grazing on 120 acres owned by Mr. Brad Foss. The Debtors rent a rural farmhouse.

### B. *Farmers Bank Debt*

On April 16, 1996, the Debtors executed a promissory note and loan agreement in favor of FCS of the Mountain Plains PCA ("FCS Mountain Plains") in the original principal sum of $200,000.00 ("April 16, 1996 Note").

To secure the April 16, 1996 Note, the Debtors contemporaneously executed a security agreement ("April 16, 1996 Security Agreement") in favor of FCS Mountain Plains which gave FCS Mountain Plains a security interest in (1) all processed and unprocessed feed, grain and harvested crops; (2) all annual and perennial crops; (3) "[a]ll livestock branded or unbranded now owned or in possession of the Debtor or hereafter acquired specifically including but not limited to 28 steers; 35 heifers; 25 baby calves; 86 cows; 3 bulls; 11 replacement heifers; 60 cows/purchase" (hereinafter collectively referred to as "Livestock"); (4) "[a]ll farm and ranch machinery and equipment of whatever kind and description specifically including, but not limited to the following: ALL FARM MACHINERY AND EQUIPMENT LISTED ON THE ATTACHED SECURITY AGREEMENT EXTENSION SHEET DATED APRIL 16, 1996" (hereinafter referred to

as "Equipment")[3]; (5) all inventory owned and thereafter acquired; and (6) all accounts and general intangibles owned or thereafter acquired. The FCS Mountain Plains' April 16, 1996 Note and the Security Agreement were assigned to Farmers Bank on June 11, 1998. The parties, together with the Chapter 7 Trustee, have agreed and stipulated that Farmers Bank properly perfected its security interest in the Livestock and Equipment.

On July 2, 1998, the Debtors executed a document entitled "Allonge to Evidence Restructured Promissory Note." This document was executed because "debtors are/were unable to meet the original repayment schedule as outlined in the original Promissory Note ..." As a result, the repayment schedule on the April 16, 1996 Note was modified.

The April 16, 1996 Note was again modified by a "Modification of Promissory Note" ("Year 2000 Modification") executed by the Debtors on June 5, 2000. The Year 2000 Modification extended the maturity date under the loan to January 15, 2001. As of the Petition Date, Farmers Bank was owed $195,314.36 on the April 16, 1996 Note, together with interest accruing from and after September 11, 2000 at the rate of $41.96 per day.

### C. *FSA Debt*

On April 11, 1997, the Debtors executed a promissory note in favor of the United States of America, acting through the Farmers Home Administration, United States Department of Agriculture (n/k/a FSA), in the original principal sum of $219,530.00 ("April 11, 1997 Note"). The April 11, 1997 Note was a loan obtained as

---

**2.** However, Mrs. Larson testified that she has not been driving a truck since October of 2000.

**3.** Fifty-plus items of equipment and machinery are listed on the Security Agreement Extension Sheet dated April 16, 1996.

part of disaster relief following a hailstorm in Weld County, Colorado.

On April 17, 1998, the Debtors executed a promissory note (apparently rescheduling the debt evidenced in the April 11, 1997 Note) in favor of the FSA in the original principal sum of $227,741.70 ("April 17, 1998 Note").

In addition, a Security Agreement was executed by the Debtors which also granted the FSA a security interest in the same Livestock and Equipment as that securing the obligation owed to Farmers Bank. The parties, together with the Chapter 7 Trustee, have agreed and stipulated that the FSA properly perfected its security interest in the Livestock and Equipment. Unlike the debt owed to Farmers Bank, the notes and security agreement evidencing the debt to the FSA were *not* modified after May 23, 2000.

As of the Petition Date, the Debtors owed $200,952.21 to the FSA.

### D. *Debtors' Bankruptcy Case*

As stated above, the Debtors filed for bankruptcy relief under Chapter 7 of the United States Bankruptcy Code on September 11, 2000. On the Petition Date, the Debtors listed no real property. The Debtors listed on their Schedule B, the following personal property:

Cattle: 121 Cows $75,625, 117 calves $49,725, 2 Bulls $1700

**4.** According to Debtors, this represents the cattle that remained after Farmers Bank sold a portion of the cattle on October 4, 2000. Cattle sold included: 52 cows for the sum of $29,008.20; 117 calves for the sum of $52,884.14; and one bull for the sum of $762.60. The Debtors testified that they intend to use and are using the remaining cattle for breeding purposes and maintaining their cow/calf operation.

In addition, the Debtors listed farming equipment and implements valued at $146,932.00.

On September 29, 2000, Farmers Bank filed an Emergency Motion to Approve Stipulation for Relief from Automatic Stay and for Abandonment. On October 2, 2000, this Court entered an Order Approving the Stipulation for Relief from Automatic Stay and for Abandonment. By its Order, the Court allowed Farmers Bank to obtain possession and sell some of the Livestock. That portion of the Livestock was sold by Farmers Bank on October 4, 2000. The sale generated $78,222.13 in proceeds which Farmers Bank applied to the Debtors' loan.

On November 3, 2000, the Debtors filed certain amended schedules. Debtors, by their Amended Schedule B, valued the remaining Livestock at $39,459.00. In addition, on November 3, 2000, the Debtors amended their claimed exemptions in their Amended Schedule C. In particular, the Debtors' Amended Schedule C provides as follows:

| Description of Property | Law Providing Each Exemption | Current Market [Value] of Property |
| --- | --- | --- |
| Section 522 Cattle 68 Cows $37,933.80 and two Bulls 1,525.20 [4] | 13–54–102(1)(g) | $ 39,459.00 |
| EQUIPMENT List Schedule B[5] [sic] [6] | 13–54–102(1)(g) CRS 13–54–102(1)(g) | $158,383.00 |

**5.** As is set forth in greater detail below, this Court finds that the fifty-plus items listed in Schedule B are all items generally used in ranching or farming.

**6.** It would appear that this is a typographical error. Based upon the arguments made in the pleadings and statements at trial it appears that this should be COLO.REV.STAT. § 13–54–102(1)(*i* ).

Debtors each claim exemptions under 13–54–102(1)(g) of $25,000 (total $50,000) and under 13–54–102(1)(i) of $10,000 ($20,000) in the above described property. Total exemption claimed for both debtors $70,000 in the Section 522 cattle and equipment listed on schedule B.

On November 7, 2000, the Debtors filed a Motion to Avoid Security Interest of the FSA Under 11 U.S.C. § 522(f) and a Motion to Avoid Security Interest of Farmers Bank Under 11 U.S.C. § 522(f). Debtors, by their Motion to Avoid Security Interest of the FSA under 11 U.S.C. § 522(f), sought to avoid the lien of FSA in the following property: (1) the remaining cattle (68 cows and two bulls) in the sum of: $39,459.00; and (2) Equipment valued in the sum of $27,600.00. Debtors, by their Motion to Avoid Security Interest of Farmers Bank in Exempt Property Under 11 U.S.C. § 522(f), sought to avoid the lien of Farmers Bank in the following property: (1) the remaining cattle (68 cows and two bulls) in the sum of: $39,459.00; and (2) Equipment valued in the sum of $34,100.00. Furthermore, Debtors, by way of their two Motions, sought permission to avoid the FSA's lien in a 1972 John Deere Model 4620 to the extent of $2,941.00 and permission to redeem the remaining value for $3,559.00.[7] On December 5, 2000, Creditors filed their Objection to Debtors' Motions to Avoid Security Interest of Farmers Bank and the FSA.

On November 8, 2000, Creditors filed their Objection to Debtors' Claimed Exemptions.[8] Debtors filed their Response to the Creditors' Objection to Claimed Exemptions on November 27, 2000.

On October 19, 2000, Farmers Bank filed a Motion for Relief from the Automatic Stay and for Abandonment with respect to the remaining Livestock and Equipment. The FSA filed its Joinder thereto on November 1, 2000. The Debtors filed their Answer to the Motion and Joinder on November 6, 2000. The Trustee filed a Response to the Motion and Joinder on November 7, 2000.

On November 29, 2000, the Honorable Donald E. Cordova, Bankruptcy Judge, entered an Order granting Farmers Bank's Motion for Relief from Stay and the FSA's Joinder, allowing the remaining Livestock and Equipment to be sold. The Court further ordered that $70,000.00 from the sales proceeds be placed into a separate accounting pending this Court's resolution of issues related to Debtors' two Motions to Avoid Security Interest and the Creditors' Objection to Claimed Exemptions.

On December 29, 2000, this Court conducted an evidentiary hearing in regard to the pending Motions and Objections.[9] As of the time of the hearing, the Livestock and Equipment had evidently not yet been sold by the FSA and Farmers Bank.

7. The Plaintiffs have presented little if any information or evidence supportive of this request from which the Court could make a determination. As a consequence, the Court will decline from ruling on this request at this time.

8. The Chapter 7 Trustee did not file any objection to the exemptions at issue herein.

9. At the beginning of the hearing, the parties stipulated to the admission of all the exhibits of Farmers Bank, the FSA and Debtors. These exhibits included, but were not limited to, photocopies of all the loan instruments, security agreements and financing statements. In addition to the introduction of these exhibits into evidence, the Debtors called several witnesses from the community along with the Debtor-husband's father. The Debtors also testified. Farmers Bank called Kenneth Stumpf, a loan officer at the Bank.

## IV. *DISCUSSION*

### A. *Burdens of Proof*

#### 1. FSA's and Farmers Bank's Objection to Debtors' Claimed Exemptions

 Once the exemption is claimed, the party objecting to a claimed exemption has the burden of proving that the exemption is not properly claimed. Fed. R.Bankr.P. 4003(c); *see also, In re Coleman,* 209 B.R. 739, 741 (Bankr.D.Colo. 1997). However, if the objecting party can produce evidence to rebut the exemption, then the burden of production shifts to the debtor to come forward with unequivocal evidence to demonstrate that the exemption is proper (*In re Carter,* 182 F.3d 1027, 1029 n. 3 (9th Cir.1999)), although the burden of persuasion will remain with the objecting party. *Id.*

#### 2. Debtors' Motions to Avoid Security Interests of FSA and Farmers' Bank

 Closely tied to the Creditors' Objection to Debtors' Claimed Exemptions are the Debtors' Motions to Avoid Security Interest of FSA and Farmers Bank. In lien avoidance actions, debtors have the burden of showing they are entitled to avoid a lien under 11 U.S.C. § 522(f). *In re Catli,* 999 F.2d 1405, 1406 (9th Cir. 1993); *In re Bozzelli,* 227 B.R. 770, 772 (Bankr.E.D.Pa.1998); *In re Kerbs,* 207 B.R. 211 (Bankr.D.Mont.1997). However, a debtor can meet his/her burden of proof by establishing an entitlement to an exemption by listing that exemption on his/her schedules and designating the basis for each exemption claimed in a clear and concise manner. *See In re Maylin,* 155 B.R. 605, 614 (Bankr.D.Me.1993). Once the debtor has made such a showing, the burden then shifts to the creditor challenging the exemption to demonstrate that the exemption claimed is not proper. *Id.; see also* Fed.R.Bankr.P. 4003(c).

### B. *Exemption Issues*

#### 1. Debtors Are Engaged in Agriculture as Their Principal Occupation, so as to Permit the Use of the Exemption Found in Colo.Rev. Stat. § 13–54–102(1)(g)

 Based upon the testimony and evidence before the Court, this Court believes that these Debtors are engaged in agriculture as their principal occupation. Thus, the Debtors may use the exemption found in Colo.Rev.Stat. § 13–54–102(1)(g).[10]

Creditors' contend that the Debtors are truck drivers and that they are not engaged in agriculture as their principal occupation. Therefore, they contend, (a) Debtors are not entitled to claim the agricultural exemption under Colo.Rev.Stat. § 13–54–102(1)(g) and thus, (b) Debtors cannot avoid the security interest in the remaining Livestock under 11 U.S.C. § 522(f). In support of this proposition, Creditors cite to *In re Case,* 66 B.R. 44 (Bankr.D.Colo.1986). In the *Case* matter, Bankruptcy Judge Roland J. Brumbaugh determined that the debtor/wife was not entitled to claim the Colorado exemption under Colo.Rev.Stat. § 13–54–102(1)(g) because she was not involved in ranching as her "principal occupation." The debt-

---

10. Colo Rev.Stat. § 13–54–102(1)(g) provides that the following is exempt from levy and sale under writ of attachment or writ of execution:

In the case of every debtor engaged in agriculture as the debtor's principal occupation, including but not limited to farming, ranching, dairy production, and the raising of livestock or poultry, all livestock, poultry, or other animals, and all tractors, farm implements, trucks used in agricultural operations, harvesting equipment, seed, and agricultural machinery and tools in the aggregate value of *twenty-five thousand dollars;* ... [Emphasis added.]

or/wife in *Case* had held full-time employment outside of the family ranch for 16 years. The court found that it could not "ignore the unique language"—i.e., "principal occupation ... used by the General Assembly in subsection (1)(g)." *Id.* at 45.

While this Court is not familiar with the detailed underlying facts of *Case*—as the underlying facts are not described in detail in the written opinion—this Court believes that based upon the factual summary contained in the *Case* opinion, the Debtors' situation here is factually and legally distinguishable. First, the unrefuted testimony of both Mr. and Mrs. Larson is that they each recently began trucking to save their farming business—a business or occupation that had been a way of life for each of them and for *at least* three generations for each of their families. Second, the uncontroverted testimony of both Mr. and Mrs. Larson is that they began trucking with reluctance. In fact, both Mr. and Mrs. Larson testified that, with respect to Mrs. Larson, she steadfastly resisted driving a truck but finally did so only as a last resort to save the farming business. Third, the testimony of the Debtors, Mr. Larry Duell (a fertilizer salesman in the Weld County area), and Mr. Dwayne Wolf (a sales representative for a seed company in the Weld County area), would suggest that it is fairly common for farmers and ranchers in Weld County to take on employment outside of the family farm for at least part of the year in order to supplement farm income and pay bills.[11] Fourth, the undisputed testimony of the Debtors and Jack Larson, the father of the Debtor/husband, was that most, *if not all,* of the income from trucking was dedicated to paying the bills related to the family and its farming/ranching business. Fifth, both Mr. and Ms. Larson expressed a credible and sincere intent to return to working full-time as farmers/ranchers once they are able to get back on their feet financially.[12] Sixth, Messrs. Duell and Wolf corroborated the Debtors and Jack Larson's testimony about the family and recent activities as farmers and/or ranchers. And finally, while they *drove/drive* trucks approximately 40 hours per week they, and their children, also continue at this present time to raise cattle and manage the farm in their so-called "spare time."

■ This Court believes that the test utilized in the Eighth Circuit, set forth in *Production Credit Ass'n of St. Cloud v. LaFond (In re LaFond),* 791 F.2d 623 (8th

11. Mr. Duell stated that of his client-farmers in his customer area, about 50% of farm wives work, at least in some capacity, away from the family farm during the year. He also stated that about 20% of husband farmers work away from the family farm at least in some capacity during a portion of the year. Mr. Wolf testified that of his clients, about 40% to 50% of farmers (both husbands and wives) work away from the family farm during a portion of the year.

12. The current exemption statute is much broader than its predecessor in defining "debtor engaged in agriculture as the debtor's principal occupation." Specifically, the current statute provides for the exemption "[i]n the case of every debtor engaged in agriculture as the debtor's principal occupation, *including but not limited to* farming, ranching, dairy production, and the raising of livestock or poultry ..." The prior statute provided that the exemption was allowed, "[i]n the case of every debtor engaged, as his principal occupation, in agriculture or livestock or poultry raising, livestock and poultry ..." Because of (a) the legislative change which, according to the Bill Summary to Senate Bill 00–003, "[e]xpands the range and increases the value of assets that are exempt from seizure ..." and (b) in light of Article XVIII, § 1 of the Colorado Constitution, which commands the legislature to enact "liberal homestead and exemption laws," this Court concludes that the "including but not limited to" language may encompass debtors who are engaged in "agriculture," but who are *not necessarily* farmers, ranchers, dairy producers, or those who raise livestock or poultry.

Cir.1986), is appropriate in ascertaining whether debtors are engaged in farming or ranching as their principal occupation under CoLo.Rev.Stat. § 13–54–102(1)(g). In determining whether a debtor is a "farmer" under 11 U.S.C. § 522(f)—and, by implication, whether a debtor is engaged in farming or ranching as his/her principal occupation under CoLo.Rev.Stat. § 13–54–102(1)(g)—the *LaFond* test requires a court to:

> take into account the intensity of a debtor's past farming activities and the sincerity of his intentions to continue farming, as well as evidence that [the] debtor is legitimately engaged in a trade which currently and regularly uses the specific implements or tools exempted and on which lien avoidance is sought.

*LaFond,* 791 F.2d at 625 (citations omitted).

The evidence is clear that, *at a minimum,* Debtors were principally, if not exclusively, and actively involved in farming and/or ranching during the late–1970s through 1998. Furthermore, both Mr. and Mrs. Larson come from families that can date back their farming many generations. Until 1998, farming and/or ranching was the foundation and livelihood of the Debtors' family. The evidence also established that the Debtors sincerely and without qualification intend to pursue and continue farming and/or ranching. In fact, this Court believes—contrary to the argument of the Creditors—that this intent is demonstrated by—*not contradicted by* —their taking on employment as truckers in order to service farm debt and sustain the farming business. Finally, the Equipment which the Debtors seek to exempt is equipment legitimately utilized and involved in farming. As a result, this Court believes that the Debtors can claim exemptions under CoLo.Rev.Stat. § 13–54–102(g) as they are engaged in agriculture as their principal occupation.[13]

## 2. Debtors' Equipment Does Qualify as "Stock in Trade, Supplies, Fixtures, Maps, Machines, Tools, Electronics, Equipment, Books, and Business Materials" "of [the] Debtors" Which Is "Used and Kept for the Purpose of Carrying

**13.** This Court would note, however, that a differing conclusion was reached under somewhat similar—but distinguishable—facts in *Johnson v. Border State Bank (In re Johnson),* 230 B.R. 608 (8th Cir. BAP 1999). In *Johnson,* the debtor had worked on his father's farm following high school. Thereafter, in 1985, he began his own farming operations. Over the years of farming he purchased three parcels of real estate for farming and he lost two of those three parcels following a divorce from his wife in 1997. The only remaining parcel at the time of his bankruptcy filing was a 73 acre homestead. He was not farming on the homestead. Also, on the date of filing he owned 35 beef cows and 35 calves. The debtor's father raised and tended to the cows in exchange for some of the profits from the sale of the cows. The debtor, himself, however, was not involved in the care of the cows. Instead, the debtor was a full-time employee of a window company and had been employed with the company for 14 years. The debtor had not derived any income from the farm since 1996 and listed no income or expenses from the farming operations in his bankruptcy schedules. The debtor stated that he did not farm and he did not know exactly when he might start farming again. The court held that, under the facts of the case, the debtor simply did not satisfy the test set forth in *Production Credit Ass'n of St. Cloud v. LaFond (In re LaFond),* 791 F.2d 623, 626 (8th Cir.1986).

The present case is distinguishable from *Johnson* for the reason that (a) these Debtors still raise cattle themselves; (b) Debtors were employed as truckers during only the last two years; (c) all of the trucking income has been used to pay for the farming and ranching business and to support the family; and (d) the Debtors have expressed a sincere and unqualified intent to resume farming as a full time occupation.

**on Any Gainful Occupation" Pursuant to Colo.Rev.Stat. § 13–54–102(1)(i)[14]**

■■ The evidence before the Court would also support a finding that the Equipment listed by the Debtors is "used and kept for the purpose of carrying on any gainful occupation." Colo.Rev.Stat. § 13–54–102(1)(i). In fact, the Equipment listed by the Debtors—by its very nature—would seem to have virtually no other use except in the context of the business of farming and ranching. In order to claim an exemption for the Equipment, there needs to be evidence demonstrating that the Debtors, in fact, used the Equipment. *See, e.g., In re Raymond*, 132 B.R. 53, 54 (Bankr.D.Colo.1991), *aff'd*, 987 F.2d 675 (10th Cir.1993). Here, the Debtors and Jack Larson each testified that the equipment listed was *not only used* by the Debtors in their farming and ranching operations *but was an integral part of those operations*.[15] Moreover, the purpose of the Bankruptcy Code and the Colorado exemption statutes are to provide a debtor with a "fresh start." The "fresh start"

includes a discharge of debts and a means by which a debtor can continue on in a trade or profession—i.e., preservation of essential "stock in trade, supplies, fixtures, maps, machines, tools, equipment, books, and business materials ..." *See, e.g., In re Keyworth*, 47 B.R. 966, 974 (D.Colo. 1985).[16]

**3. Farmers Bank's and the FSA's Liens in Remaining Livestock May be Avoided in Accordance with 11 U.S.C. § 522(f) and Colo. Rev.Stat. § 13–54–102(1)(g) as "Tools of the Trade"**

■■ Allowing avoidance of liens on livestock as "tools of the trade" may appear, at first blush, improper or incongruous. However, after consideration of applicable Tenth Circuit case law, it is not so. Treatment of livestock as "tools of the trade" is reasonable, logical and established by controlling Tenth Circuit precedent. *Heape v. Citadel Bank of Independence (In re Heape)*, 886 F.2d 280, 282 (10th Cir.1989).

14. Colo.Rev.Stat. § 13–54–102(1)(i) provides that the following shall be exempt from levy and sale under a writ of attachment or a writ of execution:

> The stock in trade, supplies, fixtures, maps, machines, tools, electronics, equipment, books, and business materials of any debtor used and kept for the purpose of carrying on any gainful occupation in the aggregate value of ten thousand dollars; ...

15. This Court does, however, recognize that the testimony of Jack Larson would suggest that the equipment was traded back and forth for use between the Debtors and Jack Larson. It was the practice of the Debtors to use equipment owned by Jack Larson, as needed, while Jack Larson would, at times, use equipment owned by Debtors. In other words, if Jack Larson had a piece of equipment that the Debtors needed, which they did not own themselves, he would lend it to them. The same would be true if Jack Larson did not have a piece of equipment which was owned

by the Debtors. Nevertheless, the evidence and testimony before this Court does not demonstrate that the equipment was *not* used solely for farming. Furthermore, there is no evidence that would suggest that the equipment actually changed hands, in terms of ownership or control, or that the equipment was otherwise concealed.

16. At the time of the hearing in regard to this matter the Equipment had not been sold by the FSA and Farmers Bank. Nevertheless, this Court recognizes that the Equipment may have been sold at the time this Order enters. However, based upon the testimony and evidence before this Court, this Court holds the proceeds are exempt as the Debtors have indicated an intent to use the proceeds to continue in their ranching operations. *But see, In re Smith*, 29 B.R. 11, 12 (Bankr.D.Or.1983) (where debtor did not produce evidence that he was going to reinvest proceeds in his "tools of trade," exemption would not be allowed).

The Colorado legislature has exempted from levy and sale under writ of attachment or writ of execution "all livestock" (with a limitation of $25,000.00). Colo.Rev. Stat. § 13–54–102(1)(g). Debtors contend that pursuant to 11 U.S.C. § 522(f), the liens of Farmers Bank and the FSA may be avoided pursuant to 11 U.S.C. § 522(f).

Section 522(f) of the Bankruptcy Code provides, in pertinent part:

(f)(1) Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

(B) a nonpossessory, nonpurchase-money security interest in any—

(i) household furnishings, household goods, wearing apparel, appliances, books, animals,[17] crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;

(ii) *implements*, professional books, *or tools, of the trade of the debtor or the trade of a dependent of the debtor* . . .

(Emphasis added.)

"Tools of the trade" is not defined in the Bankruptcy Code nor is it defined in the legislative history of the Bankruptcy Code. The FSA and Farmers Bank both contend that the Livestock cannot be considered tools of the Debtors' trade as cattle were not intended to be protected under the "tools of the trade" provision of the Colorado exemption law.[18]

It is the Debtors' contention that this Court should utilize the "use" test discussed in *In re Heape*, 886 F.2d at 282 and as set forth in *Walkington v. Production Credit Ass'n (In re Walkington)*, 42 B.R. 67, 72 (Bankr.W.D.Mich.1984); *see also, In re Bulger*, 91 B.R. 129, 131–32 (Bankr. M.D.Ala.1988). In the *Heape* case, the court looked to a decision of the Kansas Supreme Court which accepted the "use" test when it defined "tools of the trade" as found in the Kansas exemption statute. *Heape*, 886 F.2d at 282. The court quoted *Reeves & Co. v. Bascue*, 76 Kan. 333, 91 P. 77 (Kan.1907) whereby the Kansas Supreme Court held that "[for] tools and implements . . . [to come within] the oper-

**17.** The term "animals" in 11 U.S.C. § 522(f)(2)(A) refers to animals that are "held primarily for the personal, family, or household use of the debtor or a dependent of the debtor." The Livestock involved herein is not "held primarily for the personal, family, or household use of the debtor or a dependent of the debtor." Thus, this Court must look to 11 U.S.C. § 522(f)(2)(B), which provides for avoidance of items used in the business or trade of a debtor but does not include a separate specific category for "animals." *Heape v. Citadel Bank of Independence (In re Heape)*, 886 F.2d 280, 282 (10th Cir.1989).

**18.** The cases cited in support of this proposition by the FSA and Farmers Bank are *In re Patterson*, 825 F.2d 1140 (7th Cir.1987) and *Wilson v. Barber (In re Wilson)*, 734 So.2d

1214 (La.1999), *aff'd.* 182 F.3d 319 (5th Cir. 1999). At least in the context of the claimed exemption asserted by the Debtors, pursuant to Colo.Rev.Stat § 13–54–102(1)(g), this Court believes that *Patterson* and *Wilson* are distinguishable from the matter at hand. First, neither of these cases dealt with the application of Colorado law in regard to exemptions and lien avoidances under 11 U.S.C. § 522(f). Second, each of the state exemption statutes involved in *Wilson* and *Patterson* were limited to "tools" or "tools of the trade." The Colorado exemption statutes expressly provide for an exemption for "all livestock" (Colo.Rev.Stat. § 13–54–102(1)(g)) and, separately, "tools" (Colo.Rev.Stat. § 13–54–102(1)(i)).

ation of the statute ... [i]t is enough that they belong to the ... [debtor], that they are necessary and are personally used for the purpose of carrying on his trade or business." *Heape*, 886 F.2d at 282, *quoting*, *Reeves*, 76 Kan. at 333, 91 P. at 77.

Likewise, the "use" test enunciated in *Heape* is consonant with the Colorado exemption statute and case law from the District of Colorado. Specifically, the Colorado exemption statute itself imposes a "use test" by its very terms: "The ... tools ... of any debtor *used* and kept for the purpose of carrying on any gainful occupation ..." (emphasis added). Colorado courts have also recognized a "use" test when discerning whether a particular "tool" fits into the exemption statute. *See, e.g., In re Raymond*, 132 B.R. 53 (Bankr. D.Colo.1991), *aff'd.* 987 F.2d 675 (10th Cir.1993) (the court held that the debtors were not entitled to the Colorado tools of the trade exemption absent a showing that either debtor *used* the equipment for the purpose of carrying on gainful employment).[19]

The testimony and evidence before this Court demonstrates that the remaining 68 cows and two bulls are in the nature of

"breeding stock"—not simply feedlot cattle or livestock held for sale. The testimony suggests that the two bulls are sufficient to service the remaining cows for the purpose of producing future generations of cattle. Although the Debtors acknowledge that the current breeding operation is not particularly effective or productive—as the bulls are older and service fewer cows, thus producing fewer offspring—nonetheless, the Debtors' "fresh start" is dependant on these 68 cows and two bulls to produce future calves and income.[20]

"Breeding stock to the livestock farmer is the functional equivalent of the crop farmer's tractors—a means of producing physically distinct agricultural products." *Heape*, 886 F.2d at 283; *see also, e.g., In re Parrotte*, 22 F.3d 472, 476 (2d Cir.1994) (bulls were necessary instruments in the ultimate process of producing milk for sale by a dairy farmer); *In re Cook*, 66 B.R. 3, 5 (Bankr.W.D.Wis.1985) (dairy cows are specialized tools of the trade of a dairy farmer). This Court agrees with the Tenth Circuit in concluding that "if the debtor were stripped of these basic resources [i.e., here, the remaining Livestock], he or she would be unable to begin anew in farming [or ranching]." *Id.*[21]

---

**19.** *In re Heape*, 886 F.2d 280 (10th Cir.1989), discussed the Kansas exemption statute, not the Colorado exemption statute. The Kansas exemption statute addressed in *Heape* provided:

> *Personal property; articles exempt.* Every person residing in this state shall have exempt from seizure and sale upon any attachment, execution or other process issued from any court in this state, the following articles of personal property: ...
>
> (5) The books, documents, furniture, instruments, tools, implements and equipment, *the breeding stock,* seed grain or growing plants stock, or the other tangible means of production regularly and reasonably necessary in carrying on the person's profession, trade, business or occupation in an aggregate value not to exceed five thousand dollars.

Kan.Stat.Ann. 60–2304 (1983) (emphasis added). Colo.Rev.Stat. § 13–54–102(1)(g) exempts *"all livestock"* (emphasis added).

**20.** The Court agrees with the distinction set forth by the Tenth Circuit in *In re Heape*, regarding livestock versus "breeding stock." *Heape*, 886 F.2d at 284 n. 6. "Breeding stock can be distinguished from livestock held for sale, the latter being more in the nature of inventory or raw materials." *Id. citing In re Cook*, 66 B.R. 3, 4 (Bankr.W.D.Wis.1985). At the time the Debtors filed bankruptcy and at the time of the amendments to the Debtors' claimed exemptions, the remaining Livestock was held as "breeding stock."

**21.** Other courts have determined that cattle or livestock cannot be included in tools of the trade under 11 U.S.C. § 522(f). Two exam-

The Debtors have established a long tradition in farming and ranching. They have further established a credible and determined intent to continue farming and/or ranching in the future. Without their "breeding stock," it will be virtually impossible for these Debtors to obtain a fresh start.[22]

> Farming is a unique business, implying self employment and economic independence and self-determination. To give a farmer the wherewithal for a fresh start includes not only hand tools, but a so the equipment, implements, breeding stock and other basic necessities for beginning anew on a modest scale as a modern food producer.

*Heape*, 886 F.2d at 283.

Where, as here, the Livestock is "breeding stock," the Creditors' nonpossessory nonpurchase money liens in the Livestock are avoidable under 11 U.S.C. § 522(f) because of the nature of the "breeding stock" and the necessity of "breeding stock" in the Debtors' cattle operation.[23]

---

ples of such rulings can be found in *In re Sticha*, 60 B.R. 717 (Bankr.D.Minn.1986) and *Yoder v. United States (In re Yoder)*, 32 B.R. 777 (Bankr.W.D.Penn.1983), *aff'd, in part, rev'd, in part*, 48 B.R. 744 (W.D.Pa.1984). Interestingly, in the *Sticha* case, the debtor did not claim certain livestock as exempt as tools of the trade pursuant to Minnesota statute. The court, apparently in dicta, held that "[e]ven if they had [claimed the exemption], livestock is not a tool of the trade as the term is used in the context of the exemption and lien avoidance provisions of the Bankruptcy Code." *Sticha*, 60 B.R. at 718. In the *Yoder* case, the debtor attempted to exempt "breeding stock" as tools of the trade and avoid the nonpossessory, nonpurchase-money security interest of a creditor pursuant to 11 U.S.C. § 522(f)(2)(A). The court concluded that:

> We agree that the concept of breeding stock, seed crops and tools and implements are similar, in that their exemption provides the Debtor with a fresh start. The plain words do not include animals. Animals and crops are words used in other exemption sections to describe property of the Debtor. Animals constitute property of the Debtor, which the Debtor can exempt under § 522(d)(3) and § 522(d)(5) and can avoid under § 522(f)(2)(A). The Debtor is not provided with authority to avoid nonpurchase money security interest in breeding stock under § 522(f)(2)(B), even though breeding stock may be exempt under § 522(d)(5).

*Yoder*, 32 B.R. at 781. Notwithstanding the rulings in *Yoder* and *Sticha*, this Court will follow the law of this Circuit in determining that the Debtors' cattle are, indeed, a "tool of the trade" for the purposes of 11 U.S.C. § 522(f)(2)(A).

**22.** This Court does recognize that the FSA and Farmers Bank have relief from the automatic stay to allow the remaining Livestock and Equipment to be sold. At the time of the hearing in regard to this matter the Livestock or "breeding stock" had not been sold by the FSA and Farmers Bank. This Court would nevertheless hold that the proceeds from the sale of "breeding stock" would be exempt as Debtors have indicated an intent to use the proceeds to reinvest in their cattle operation.

**23.** *But cf., In re Spykstra*, 86 B.R. 656 (Bankr. D.Colo.1988), wherein Judge Brumbaugh addressed the debtor's claimed exemption in an automobile. The issue in the case only dealt with the exemption statute, not the avoidance provisions of 11 U.S.C. § 522. The court noted that the Colorado exemption statute included separate statutes for (a) automobiles "used by any debtor for the purpose of carrying on any gainful occupation" and (b) "tools of the trade." Judge Brumbaugh held that "[b]y providing for motor vehicles in a separate subsection and specifying a different exemption amount, Colorado obviously meant that automobiles were to be treated differently than 'tools of the trade.'" *Id.* at 659. As a result, the court found that those cases which have held that motor vehicles were not "tools of the trade" under 11 U.S.C. § 522 were inapplicable because those cases analyzed the term "tools of the trade" as classified in that Bankruptcy Code section; not whether a motor vehicle, being specifically listed in a state exemption statute—in addition to a separate provision for "tools of the trade"—had to have some unique use other than as transportation to and from work. *Id.*

**4. Debtors Can "Stack" the Exemptions Provided for Under COLO. REV.STAT. §§ 13–54–102(1)(g) and (i)**

█ This Court also believes that the Debtors can "stack" the exemptions provided for under COLO.REV.STAT. §§ 13–54–102(1)(g) and (i). Farmers Bank and the FSA submit that a plain reading of these subsections would indicate that COLO.REV. STAT. § 13–54–102(1)(g) is intended solely for farming debtors to exempt their "tools of the trade." Whereas it would appear that Farmers Bank and the FSA argue that COLO.REV.STAT. § 13–54–102(1)(i) was only reserved for debtors *other* than farmers. Farmers Bank and the FSA assert that allowing a farm debtor to take an exemption under each subsection allows the farm debtor to improperly "double dip" the exemption amount and obtain a windfall never intended by the legislature.

█ This Court disagrees with the Creditors in this regard and adopts the analysis and conclusion set forth in *In re Case*, 66 B.R. 44 (Bankr.D.Colo.1986). In *Case*, the court permitted the so-called "stacking" under both subsections. Moreover, this Court notes the long-standing tradition in the courts of Colorado to construe all exemptions laws liberally in favor of debtors. Colo. Const. art. XVIII, § 1;[24] *Sandberg v. Borstadt*, 48 Colo. 96, 99, 109 P. 419, 421 (Colo.1910) ("Primarily, the exemptions law of the state are for the benefit of the residents, and they are to be liberally construed."); *See also In re Hellman*, 474 F.Supp. 348, 350 (D.Colo.1979).

In addition, this Court also believes that the legislature of the State of Colorado could have, but did not, limit farmers to the use of COLO.REV.STAT. § 13–54–102(1)(g) for equipment, machinery and tools. In fact, the legislature *did* limit "stacking" in the context of debtors utilizing exemptions under COLO.REV.STAT. §§ 13–54–102(1)(i) and 13–54–102(1)(k).[25] However, this same limitation is *not* enunciated in the context of COLO.REV.STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i). As a consequence, the Debtors herein shall be allowed to "stack" their exemptions under both COLO.REV.STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i).

**5. Each Debtor Can Claim an Exemption Under Both COLO.REV. STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i)**

█ This Court further finds that *each* Debtor is entitled to claim the full amount of the exemption under both COLO.REV. STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i). Section 13–54–101, provides that, as used in Article 54, "'Debtor' means a person whose property or earnings are subject to attachment, execution, or garnishment." Furthermore, 11 U.S.C. § 522(m) provides that Section 522 applies separately with respect to each debtor in a joint case. As a result, each debtor in Colorado whose property is subject to attachment or execution is entitled to claim his/her own exemption in the statutory

**24.** Article XVIII, § 1 of the Colorado Constitution provides that "[t]he general assembly shall pass liberal homestead and exemption laws."

**25.** Section 13–54–102(1)(k) of the Colorado Revised Statutes provides that the following are exempt from levy and sale under writ of attachment or writ of execution:

The library of any debtor who is a professional person, including a minister or priest of any faith, kept and used by the debtor in carrying on his or her profession, in the value of three thousand dollars; except that exemptions with respect to any of the property described in this paragraph (k) may not also be claimed under paragraph (i) of this subsection (1); ...

amount. *In re Ferguson*, 15 B.R. 439, 441 (Bankr.D.Colo.1981).[26]

Here, the Debtors' bankruptcy schedules indicate that the remaining Livestock and all of the Equipment is jointly owned by the Debtors. Additionally, the testimony of the Debtors is that the Equipment has been utilized by the Debtors for the farming and ranching operations. This Court believes that each Debtor can claim the full amount of the exemption under both COLO.REV.STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i) as these are personal exemptions belonging to each Debtor on personalty. *Pruitt v. Wilson (In re Pruitt)*, 829 F.2d 1002, 1005 (10th Cir. 1987). This Court further finds that because the FSA and Farmers Bank hold a nonpossessory, nonpurchase-money security interest in the Equipment, by virtue of COLO.REV.STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i) their liens are avoided to the extent of the exemptions allowed.

## B. *Constitutional Issues*

### 1. Introduction to the State and Federal Constitutional Issues

In an abbreviated fashion, the Creditors argue that: (a) Debtors use of 11 U.S.C. § 522(f) to avoid their liens using the recently increased Colorado statutory exemptions, constitutes a "retrospective" application of state law in violation of the Colorado Constitution and statutes (Colo. Const. art II, § 2; COLO.REV.STAT. § 2–4–202); (b) retrospective application of the increased exemption when invoking Section 522(f) of the Bankruptcy Code constitutes an unconstitutional "taking" of pri-

vate property without just compensation (U.S. Const. amend. V and amend. XIV; Colo. Const. art. II, § 5; Colo. Const. art. II, § 15); and (c) retrospective application of the increased exemption violates the "contracts" clauses of the state and federal constitutions because their liens become substantially and impermissibly impaired (U.S. Const. art. I, § 10; Colo. Const. art. II, § 11). The impact on the two lenders, Creditors' argue, is *substantial;* substantial impairment—or taking—of their security interest/property rights. Creditors maintain that, given the Debtors' opportunity to each claim exemptions and to "stack" their exemptions, their security interest in the collateral declined by the same amount of the increase of exemptions to which the Debtors are entitled: from a total of $13,000.00 to $70,000.00.

The Debtors respond and maintain that: (a) use of the current Colorado exemptions in a lien avoidance action under Section 522(f) of the Bankruptcy Code is not "retrospective" application of the exemption law and it is not a violation of Article II, § 2 of the Colorado Constitution because this lien avoidance does not impair a "vested right" of the Creditors and even if it did so, *still* this "vested right" must be subject to the legitimate police power of the state; (b) avoidance of Creditors' liens under the increased exemption amounts is not a "taking" of property under the Fifth Amendment of the United States Constitution because no property right of the Creditors is being "taken"; it is, instead, an adjustment of the permissible and pre-existent exemption—as is periodically done under the exemption laws—*vis-a-vis* the Debtors

---

**26.** However, whether realty is jointly or singly owned, the Colorado homestead exemption allows for only one homestead exemption because it attaches to the realty in such a manner that its protection cannot be claimed by both debtors individually. *Pruitt v. Wilson (In re Pruitt)*, 829 F.2d 1002, 1005 (10th Cir. 1987); *In re Bryant*, 221 B.R. 262, 264 (Bankr.D.Colo.1998); *but see In re Pastrana*, 216 B.R. 948 (Bankr.D.Colo.1998) (Chapter 7 debtors who were married but living apart in jointly-owned properties, were each entitled to claim Colorado homestead exemption for that property which he/she occupied).

rights, and, in any event, even if a property right here is affected the Supreme Court's three part test is satisfied, removing it from constitutional infirmity; (c) lien avoidance with increased exemptions does not violate the constitutional prohibition against impairment of contracts because the exemption statute, as remedial legislation, simply adjusts the relationship between the parties and is a legitimate and recognized economic regulation, or "police power," of the legislature; (d) the Colorado Constitution requires "liberal homestead and exemption laws" (Colo. Const. art. XVIII, § 1); and (e) the Bankruptcy Code is intended to give an honest debtor a "fresh start."

## 2. Overview of the Amendments to the Colorado Exemption Statute

COLO.REV.STAT. § 13–54–102 was amended by Laws 2000, Ch. 172, § 2, effective May 23, 2000. Of particular importance to this case were the amendments to COLO. REV.STAT. §§ 13–54–102(1)(g) and 13–54–102(1)(i).

### a. *Amendment to COLO.REV.STAT. § 13–54–102(1)(g)*

Prior to the May 23, 2000 amendments, COLO.REV.STAT. § 13–54–102(1)(g) provided that the following property was exempt from levy and sale under writ of attachment or writ of execution:

> In the case of every debtor engaged, as his principal occupation, in agriculture or livestock or poultry raising, livestock and poultry not exceeding in the aggregate a value of *three thousand dollars*, and horses, mules, wagons, carts, machinery, harness, implements, and tools not exceeding in the aggregate a value of *two thousand dollars*.

(Emphasis added.)

As amended May 23, 2000, COLO.REV. STAT. § 13–54–102(1)(g) provides that the following is exempt from levy and sale under writ of attachment or writ of execution:

> In the case of every debtor engaged in agriculture as the debtor's principal occupation, including but not limited to farming, ranching, dairy production, and the raising of livestock or poultry, all livestock, poultry, or other animals, and all tractors, farm implements, trucks used in agricultural operations, harvesting equipment, seed, and agricultural machinery and tools in the aggregate value of *twenty-five thousand dollars*.

(Emphasis added.) To summarize the change, COLO.REV.STAT. § 13–54–102(1)(g) increased the maximum allowed exemption *from an aggregate value of five thousand dollars to twenty-five thousand dollars—a five-fold increase.*

### b. *Amendment to COLO.REV.STAT. § 13–54–1020(I)(i)*

Section 13–54–102(1)(i) of the Colorado Revised Statutes, prior to May 23, 2000, provided that the following property was exempt from levy and sale under a writ of attachment or a writ of execution:

> The stock in trade, supplies, fixtures, maps, machines, tools, equipment, books, and business materials of any debtor used and kept for the purpose of carrying on any gainful occupation in the aggregate value of *fifteen hundred dollars*.

(Emphasis added.)

As amended May 23, 2000, COLO.REV. STAT. § 13–54–102(1)(i) provides that the following shall be exempt from levy and sale under a writ of attachment or a writ of execution:

> The stock in trade, supplies, fixtures, maps, machines, tools, electronics, equipment, books, and business materials of any debtor used and kept for the

purpose of carrying on any gainful occupation in the aggregate value of *ten thousand dollars.*

(Emphasis added.) Colo.Rev.Stat. § 13–54–102(1)(i) increased *from an aggregate value of fifteen hundred dollars to ten thousand dollars—a more than six-fold increase.*

Thus, the amendments to the state exemption law, enacted after the execution of the subject loans and security agreements—and specifically the two sections, 102(1)(g) and (1)(i)—resulted in a substantial and financially consequential increase in the Debtors' ability to claim property as exempt. Conversely, the amendments also resulted in a substantial and financially consequential decrease in the value of collateral available to the Creditors.

### 3. Legislative Intent

The statutory history of Colo.Rev.Stat. § 13–54–102, reveals that prior amendments to the exemption statute provided for the "applicability" or application of the statute. For instance, in the 1991 amendments, which added paragraph (1)(s) and subsection (3), Laws 1991, H.B. 91–1233, § 7, provided:

**Applicability.** This Act shall apply to writs of execution, attachment, or garnishment issued by a court in any action brought on or after the effective date of this act.

The 1994 amendments added paragraph (1)(u). Laws 1994, S.B. 94–2, § 3 provided:

**Effective date—applicability.** This act shall take effect upon passage, and shall apply to any writ issued on or after said date.

The 1995 amendments re-designated former paragraph (1)(1) as subparagraph (1)(1)(I)(A) and rewrote subparagraph (1)(1)(I)(A) and also added sub-subparagraph (1)(1)(I)(B) and subparagraphs (1)(1)(II) and (1)(1)(III). Laws 1995, H.B. 95–1226, § 2 provided:

**Effective date—applicability.** This act shall take effect July 1, 1995, and shall apply to debts incurred on or after said date.

Remarkably, the May 23, 2000 amendments—the most significant changes in Colorado exemptions since 1981—provide very little insight as to the legislature's intent regarding the applicability of the amendments, other than the statement that the "effective date" is May 23, 2000. This Court has reviewed Senate Bill 00–003, the bill introduced to enact the recent amendments and the various versions prior to enactment.[27] From the bill, and its various revisions and other manifestations, this Court can glean the following: (1) as set forth in the Bill Summary, the bill "[e]xpands the range and increases the value of assets that are exempt from seizure ..." and (2) pursuant to the "Safety clause," the legislature stated that the "general assembly hereby finds, determines, and declares that this act is necessary for the immediate preservation of the public peace, health and safety." While this does not appear to resolve the issue of the legislature's intent regarding the effective date of application, it may, as discussed in greater detail below, resolve some of the issues raised regarding whether the statute and its application to debt in existence prior to the enactment of the law violate the United States Constitution and Colorado Constitution.

---

**27.** The Court reviewed not only the enacted law, version date May 23, 2000, but also: (1) the Rerevised Version, dated May 3, 2000; (2) the Revised Version dated April 25, 2000; (3) the Reengrossed Version, dated January 18, 2000; (4) the Engrossed Version, dated January 17, 2000; and (5) the Introduced Version, dated January 5, 2000.

Although the most recent amendments are silent as to the application of this law to preexisting debts, it would appear that historically, the legislature has specifically set out that the amendments shall apply to either: (1) any writs of execution, attachment, or garnishment issued on or after the effective date of the statute, or (2) any debts incurred after the effective date of the statute. As the legislature has left unclear the application of the amendments to debts incurred prior to the effective date of the statute, this Court will look to how the United States Constitution, the Colorado Constitution, the Bankruptcy Code and state and federal courts have applied new, revised or amended exemption statutes.

**4. Burdens and Presumptions in Analyzing the Amended Exemption Statute**

■ "A statute is presumed to be constitutional and the burden is on the party attacking the statute to establish its unconstitutionality beyond a reasonable doubt." *People ex rel. S.M.*, 7 P.3d 1021, 1024–25 (Colo.App.2000) (citation omitted); *see also In re Punke*, 68 B.R. 936, 939 (Bankr.N.D.Iowa 1987) (the creditor alleging that an increase in the Iowa bankruptcy exemption is unconstitutional has the burden of proof). A statute is not necessarily unconstitutional because the facts upon which it operates occurred before the adoption of the statute. *Id.* (citations omitted). In this instance, the burden is on the FSA and Farmers Bank to establish, beyond a reasonable doubt, that the amendments to Colo.Rev.Stat. § 13–54–102(1)(g) and (i) are unconstitutional is applied to their loans. *See People ex rel. S.M.*, 7 P.3d at 1024–25.

■ In Colorado, as a general rule, legislation is presumed to have a prospective effect unless the General Assembly

expresses a contrary intent. *Shell Western E & P, Inc., v. Dolores County Bd. of Comm'rs*, 948 P.2d 1002, 1011 (Colo.1997) (citation omitted). Moreover, retroactive application of the law is highly disfavored by Colorado law. *Jackson v. State*, 966 P.2d 1046, 1052 (Colo.1998). "[F]or legislation to be given a retroactive effect without being unconstitutional, it must be clearly the intent of the General Assembly to do so, *but that intent need not be explicitly expressed in the legislation*." *Shell Western*, 948 P.2d at 1011 (citation omitted) (emphasis added). In this case, the General Assembly is silent as to whether the statute has retroactive effect. Thus, this Court must discern, if possible, whether, *implicitly*, the legislature intended to give the amended exemption statute retroactive effect.

**5. Exemptions under 11 U.S.C. § 522**

■ Section 522(b)(2)(A) of the Bankruptcy Code allows debtors to exempt "property that is exempt under Federal law, . . . or State or local law that is *applicable on the date of the filing of the petition . . .* " (emphasis added). As a general rule, "[e]xemptions are defined and determined as of the date Debtor filed his petition in bankruptcy." *In re Alagna*, 107 B.R. 301, 314 (Bankr.D.Colo.1989).

The State of Colorado has "opted out" of the federal exemption scheme provided in 11 U.S.C. § 502(d), pursuant to 11 U.S.C. § 522(b). Colo.Rev.Stat. § 13–54–107. Thus, the applicable and available exemptions to a debtor filing bankruptcy and residing in Colorado are defined by the Colorado exemption statutes. As a general rule, courts must consider the exemption statutes in *existence* as of the petition date, in determining the availability of exemptions on a debtor's property. *In re Bradshaw*, 125 B.R. 782, 783–84 (Bankr. E.D.Wis.1991); *Roemelmeyer v. Phillips*

*(In re Phillips)*, 104 B.R. 499, 502 (Bankr. S.D.Fla.1989); *Ackley State Bank v. Van Hove (In re Van Hove)*, 78 B.R. 917, 920 (N.D.Iowa 1987).

■ The issue then before this Court is when an exemption statute is amended after the security interest is granted, but before the filing of a bankruptcy case, what are the applicable exemptions available to a debtor? It is apparent from a review of the case law across the country that there seems to be a split in deciding this issue. Moreover, it appears that the Tenth Circuit has not addressed this issue. Courts have divided into essentially two camps on this issue, as follows:

 a. Debtors are limited to the applicable exemptions at the time loans were made. *See In re Sticha*, 60 B.R. 717 (Bankr.D.Minn.1986) (the court held that the debtors may only avoid the lien and claim the exemption amount in effect at the time the lien was created); *See also In re Peters*, 60 B.R. 711 (Bankr.D.Minn.1986) (application of exemptions in effect on the date of filing, instead of those exemptions in effect when the security interest was created, deprives the creditor of property without compensation); *See also, e.g., In re Fossum*, 59 B.R. 820 (Bankr. D.Minn.1986) (the court held that debtors who filed bankruptcy when the state law provided for a $5,000 exemption for tools of the trade could not claim a $10,000 exemption under an amended exemption statute effective after the date of filing).

 b. Debtors are to use the exemptions in effect on the date of filing regardless of when the laws were made. *See In re Van Hove*, 78 B.R. 917 (N.D.Iowa 1987) (extent of debtor's exemption rights are determined by reference to exemption statutes in

effect on the date bankruptcy petition was filed); *See also In re Johnson*, 69 B.R. 988 (Bankr.D.Minn. 1987) (application of the homestead exemption in effect at the time of the bankruptcy filing to a pre-existing unsecured debt does not substantially impair creditors' rights and it is, moreover, a valid exercise of the state's police power); *and see In re Punke*, 68 B.R. 936 (Bankr. N.D.Iowa 1987) (application of an increased Iowa exemption for farm machinery and equipment that was in effect at time of bankruptcy filing, but that was not in effect when the loan entered into by the parties, did not substantially impair the secured creditor's reasonable expectations so as to violate the federal contract clause).

After having reviewed the case law, this Court finds that cases determining that debtors are entitled to use exemptions in effect on the date of filing are more persuasive and more consistent with the spirit and purpose of bankruptcy and exemption laws.

## 6. Constitutionality of 11 U.S.C. § 522(f)

The FSA and Farmers Bank contend that this Court should find that the use of the amended exemption law to avoid their liens on the Debtors' property, pursuant to 11 U.S.C. § 522(f), is an unconstitutional "taking" and that this Court should rely in this matter on the United States Supreme Court in *United States v. Security Indus. Bank*, 459 U.S. 70, 75–76 n. 6, 103 S.Ct. 407, 410–11, 74 L.Ed.2d 235 (1982). In *Security Industrial*, the United States Supreme Court addressed the then recently enacted Bankruptcy Code and specifically Section 522(f). The Supreme Court was faced with the question of whether the retroactive application of Section 522(f) to

allow it debtor to avoid a lien created before the enactment of that section would violate the Fifth Amendment. In *Security Industrial*, the Court held that Section 522(f), indeed, may not be utilized to avoid a nonpossessory, nonpurchase-money security interest *that was created before the enactment of the Code*. The Supreme Court, however, did *not* address the constitutional issue. Instead, the Court determined that Congress had not intended to make the provision retroactive or had simply stated no intent as to retroactive application. Nonetheless, the Court did express doubt that retroactive application of Section 522 would be constitutional.[28]

While *Security Industrial* may be informative, it is not controlling under the facts and circumstances of this case. *Security Industrial* dealt with the retroactive application of Section 522(f) when it was newly enacted. This case deals with a loan that was executed *after* the enactment of Section 522(f), but prior to the enactment of the new state exemption limits. Most importantly, unlike the *Security Industrial* case, here, the Colorado legislature did not *create* a new right for debtors, instead the legislature merely increased a pre-existing exemption. *See In re Bartlett*, 168 B.R. 488, 500 (Bankr.D.N.H.1994). Without the avoidance power of 11 U.S.C. § 522(f), the claiming of an exemption by the Debtors herein would be largely meaningless. It is the avoidance power—which was in effect at the time that the loans were executed—which enables the Debtors to assert the exemption in order to avoid the lien of the Creditors. Indeed the Creditors' and Debtors respective rights with regard to the collateral were determined by Section 522 when the loans were executed. Those avoidance rights under 11 U.S.C. § 522(f), however, can be periodically adjusted under state exemption laws—and it is reasonable for the parties to expect such changes. *In re Punke*, 68 B.R. 936, 943 (Bankr.N.D.Iowa 1987).

## 7. Does the Amended Colorado Exemption Statute have Retroactive, Retrospective or Prospective Application?

### a. *Colorado Statutes are Presumed Prospective*

In accordance with COLO.REV.STAT. § 2–4–202, Colorado statutes are presumed to be *prospective* in application. *See, e.g., McCart v. Jordana (In re Jordana)*, 232 B.R. 469, 474 (10th Cir. BAP 1999) (in analyzing an Oklahoma statute, the Tenth Circuit held that a statute or its amendment will only have prospective effect unless it *clearly* provides otherwise). This is in recognition, in part, of the prohibition in the Colorado Constitution of retrospective laws. Colo. Const. art. II, § 11.[29] Furthermore, the Constitutions of both the United States and the State of Colorado prohibit the taking of private property without just compensation. U.S. Const., amend. V and amend. XIV; Colo. Const. art. II, § 15. Balanced against these prohibitions, Colorado has long held that homestead and exemption laws are to be construed liberally. Colo. Const. art. 18, § 1; *Case*, 66 B.R. at 45; *In re Reeder*, 60 B.R. 312 (Bankr.D.Colo.1986).

**28.** Interestingly, the three justices in the minority in *United States v. Security Indus. Bank*, 459 U.S. 70, 84, 103 S.Ct. 407, 414, 74 L.Ed.2d 235 (1982), while concurring in the affirmance, suggested that, unlike the majority of the Court, they would have possibly found 11 U.S.C. § 522(f) to be constitutional had it been necessary to reach the issue.

**29.** Article II, Section 11 of the Colorado Constitution provides that "[n]o … law … retrospective in its operation … shall be passed by the general assembly."

### b. *"Vested Rights"*

It is important to distinguish between retrospective application of a statute and retroactive application of a statute. A statute is applied retroactively if it operates on transactions or rights and obligations that occurred or existed before its effective date. *Kuhn v. State*, 924 P.2d 1053, 1056 (Colo.1996); *Ficarra v. Dep't. of Regulatory Agencies, Div. of Ins.*, 849 P.2d 6, 11 (Colo.1993). Courts have held that retroactive application of a statute is *not necessarily unconstitutional. Kuhn*, 924 P.2d at 1056; *Ficarra*, 849 P.2d at 11. If a statute effects a change that is remedial in nature, it is permissible *retroactive* application of a statute. *Kuhn*, 924 P.2d at 1056. The reason that a remedial change is not an impairment of a vested fight is because there is no vested right in a remedy. *Id. citing Continental Title Co. v. District Court In and For City and County of Denver*, 645 P.2d 1310, 1315 (Colo. 1982). Retrospective legislation, on the other hand, " 'impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty or attaches a new disability, in respect to transactions or considerations already past.' " *Id., quoting Ficarra*, 849 P.2d at 15.

A "vested right" has an "independent existence," in the sense that once it vests it is no longer dependent for its assertion upon the common law or statute upon which it may have been acquired. *Ficarra*, 849 P.2d at 15. "In other words, the repeal of a statute or the abrogation of the common law from which a right may have originated does not erase that right if it is vested, but the right remains enforceable without regard to such repeal or abrogation." *Id.* "A light is only vested when it is not dependent upon the common law or the statute under which it was acquired for its assertion, but has an independent existence." *People v. D.K.B.*, 843 P.2d 1326, 1331 (Colo.1993). Here, Farmers Bank and the FSA did not, in this Court's opinion, have a "vested right" in the collateral which was subject to the prior exemption statute. Their "right" to the continuation of the Colorado exemption statute in effect at the time the loans were entered into by the parties was dependent upon and subject to the Colorado exemption statute. This "right" did not have an independent basis under which it was acquired—it was wholly dependent upon the statute itself. Moreover, because levies and sales under writs of attachment or writs of execution—the collection methods addressed in the Colorado exemption statute—are acts to "remedy" a default by a debtor, the Colorado exemption statute is remedial in nature. "[S]ubstantive statutes create, eliminate or modify vested rights or liabilities, while procedural statutes relate only to remedies or modes of procedure to enforce such rights or liabilities." *Id.*, at 1331. "The abolition of an old remedy, or the substitution of a new one, neither constitutes the impairment of a vested right nor the imposition of a new duty, for there is not such thing as a vested right in remedies." *Id.* (*quoting* Continental Title Co., 645 P.2d at 1315) (*quoting Jefferson County, Dep't. of Social Services v. D.A.G.*, 199 Colo. 315, 317, 607 P.2d 1004, 1006 (1980)) (*quoting Moore v. Chalmers–Galloway Live Stock Co.*, 90 Colo. 548, 554–55, 10 P.2d 950, 952 (1932)).

### c. *Retroactive Application of the Statute to "Vested Rights"*

Even if the remedy of collection was construed to be a "vested" right, this Court does not believe that the application of the amended Colorado exemption statute to the FSA and Farmers Bank debt is unconstitutional. In determining whether a retroactive statute impairs or

destroys a vested right, courts have also looked to: "(1) whether the public interest is advanced or retarded, (2) whether the retroactive provision gives effect to or defeats the bonafide intentions or reasonable expectations of affected persons, and (3) whether the statute surprises persons who have long relied on a contrary state of the law." *Ficarra*, 849 P.2d at 16 (citations omitted).

The amended exemptions "[e]xpands the range and increases the value of assets that are exempt from seizure . . ." Senate Bill 00–003. Moreover, the general assembly found "that this act is necessary for the immediate preservation of the public peace, health and safety." *Id.* Clearly, the public interest *is* advanced by allowing debtors to utilize the amended exemptions pursuant to the pre-existing Bankruptcy Code Section 522.

As to the second and third factors in *Ficarra*, at least with regard to Farmers Bank, this Court finds that the retroactive application does not defeat the bonafide intentions or reasonable expectations of Farmers Bank. Importantly, this loan was amended and reinstated *after* the new exemptions were passed by the legislature and signed by the governor. The testimony of Mr. Stumpf, an officer with Farmers Bank, demonstrated that Farmers Bank was aware of (1) the exemption laws of the State of Colorado and (2) the avoidance provisions set forth in 11 U.S.C. § 522(f). His testimony further demonstrated that Farmers Bank factored the state exemption laws and avoidance provisions of the United States Bankruptcy Code into their loan approval equation. This Court believes that it is disingenuous, on Farmers Bank's part, to suggest that it was surprised by the new exemption amounts in light of the fact that its loan was modified on June 5, 2000, almost *two weeks* after the enactment of the amended exemption statute.[30]

Arguably, the amended exemption statute may have been contrary to the bonafide intentions or expectations of the FSA. However, This Court believes that given the history of state exemption statutes—here in Colorado and elsewhere in the United States—the FSA should have anticipated the possibility of further periodic adjustments to the exemption statutes. *In re Punke*, 68 B.R. 936, 943 (Bankr. N.D.Iowa 1987) (in reviewing the history of the Iowa exemption statute, the court determined that secured creditors should have anticipated the possibility of further period adjustments to the exemptions statute).

8. **The "Takings" Clauses of the United States Constitution and the Colorado Constitution**

There is no question that the liens of the FSA and Farmers Bank consti-

---

**30.** This Court might also conclude that, under Colorado law, a "novation" occurred by way of the modification on June 5, 2000. *See Moffat County State Bank v. Told*, 800 P.2d 1320, 1323 (Colo.1990). As a result, Farmers Bank's loan may have bargained away its right to prevent the avoidance of its lien interest in the Debtors' collateral by allowing the modification after the effective date of the amended exemption limits. *Averhoff v. Peoples Finance Co. (In re Averhoff)*, 18 B.R. 198, 202–03 (Bankr.N.D.Iowa 1982); *Cf., In re Peters*, 60 B.R. 711, 717 (Bankr.D.Minn.1986) (court held that because the financial transactions between the parties occurred after the effective date of 11 U.S.C. § 522(f), the objection to the constitutionality of the avoidance powers of the debtors would be denied); *but see, In re Davis*, 148 B.R. 473, 476–77 (Bankr. N.D.Tex.1992) (a mere rescheduling of a debt was not sufficient to allow debtor to avoid pre-Code lien); *but see, Yoder*, 48 B.R. at 748 (consolidated note was not a novation under Pennsylvania law, where consolidation note provided that it was given to consolidate, reschedule or reamortize, but not as satisfaction of prior notes).

tute "property" within the context of the Fifth Amendment. *Punke,* 68 B.R. at 942 (*citing Armstrong v. United States,* 364 U.S. 40, 48, 80 S.Ct. 1563, 1568–1569, 4 L.Ed.2d 1554 (1960)). However, "a property interest impairment resulting from the government action may constitute a 'mere consequential incidence' of a valid state regulation rather than rising to the level of a taking requiring just compensation." *Id.* (citation omitted). Whether there has been an unconstitutional taking requires a court to look into the facts and determine the public and private interests and the expectations of the parties. *Id.*

■ This Court agrees with the Supreme Court in the *Security Industrial* case that this type of situation "fits awkwardly into the analytical framework employed in *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)." *Security Industrial,* 459 U.S. at 75, 103 S.Ct. at 411. The "bundle of rights" in this case which accrues to FSA and Farmers Bank is, as the Supreme Court noted in *Security Industrial,* smaller than that which accrues to an owner in fee simple—*but, importantly, it is not something less than property. Id.* "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. at 2659. Nevertheless, a "taking" still can be found even when the interference arises from some public program adjusting the benefits and burdens of economic life to promote common good. Although, generally, courts have not characterized the *expectations* of either debtors or creditors affected by exemption laws as rising to the level of property interests, where there is a security interest, courts have recognized the security interest as a property interest and have viewed retrospective application of a lien avoidance power as constitutionally suspect. 2 NORTON BANKR.L. & PRAC.2D, § 46:35 (2000).

■ Here, the Court finds that the property interest impairment arises from a valid state regulation and does not rise to the level of a taking requiring just compensation. The impact that the May 23, 2000 amendments have on the security interest of the FSA and Farmers Bank under 11 U.S.C. § 522(f) "arises from a public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. at 2659. The amendments achieve a balance between the borrower, the lender and society as a whole and are therefore not an unconstitutional taking of property without just compensation. *Punke,* 68 B.R. at 944.

**9. Application of the May 23, 2000 Amendments Does Not Violate the "Contracts" Clauses of the United States and Colorado Constitutions**

■ Both the United States Constitution and the Colorado Constitutions prohibit a state from impairing vested contract rights. U.S. Const. art. I, § 10; Colo. Const. art. II, § 11. Substantial impairment of a contractual relationship is only the beginning of any inquiry. *Energy Reserves Group, Inc. v. Kansas Power and Light Co.,* 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). If a substantial impairment is found, the court must then go on to carefully scrutinize the nature and purpose of the state law. *Punke,* 68 B.R. at 940 (*citing Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244, 98 S.Ct. 2716, 2722, 57 L.Ed.2d 727 (1978)). In scrutinizing the nature and purpose of the state law, a court shall determine (a) if the

state is able to justify the regulation by pointing to a significant and legitimate public purpose and (b) whether the law is reasonable and necessary to accomplish the identified public purpose. *Id.*

■ First, does this statute impair the contractual relationship? While this Court finds that the May 23, 2000 amendments certainly modified the *expectations* of the parties, this Court does not find that the amendment *substantially* impaired the contractual relationship. *See In re Hockinson,* 60 B.R. 250 (Bankr.N.D.Ill.1986) (increase of $5,000.00 in an exemption for a mobile home from the date of contract to the date of filing held to not substantially impair the contractual relationship). The Colorado Constitution is clear that the legislature shall pass "liberal homestead and exemption laws." Colo. Const. art. XVIII, § 1. The exemption laws in Colorado have been in existence for years. In addition, 11 U.S.C. § 522(f) was in existence when the loans were originally entered into by the parties. In light of the long history behind the Colorado exemptions, this Court cannot find that the FSA's or Farmers Bank's reasonable expectations have been substantially impaired. *Punke,* 68 B.R. at 941.

### C. *Concluding Comments Regarding the State and Federal Constitutionality Issues*

On the constitutional issues, the Court finds that: (1) application of 11 U.S.C. § 522(f) and the recently established increased exemptions to the pre-existing secured interest did not result in impermissible retrospective effect on the FSA's and Farmers Bank's rights; (2) the impairment of the FSA's and Farmers Bank's property rights or expectations is not unconstitutional under the "takings" provisions of the United States and Colorado Constitutions (U.S. Const. amend. V and XIV; Colo. Const. art. II, § 15); and (3) retroactive application of the Colorado exemption statute on the FSA's rights and interests is not unconstitutional under the "contracts" clauses of the United States and Colorado Constitutions (U.S. Const. art. I, § 10; Colo. Const. art. II, § 11).

### V. *CONCLUSION*

The security interest of the FSA and Farmers Bank impairs exemptions to which the Debtors are allowed under the laws of the State of Colorado. The exemption laws applicable to the Debtors are the current exemptions. As such, the Debtors' exemptions to which they are entitled under Colo.Rev.Stat. § 13–54–102(1)(g) and (1)(i) total $70,000.00.

The Court declines to rule on the Debtors' request for permission to (1) avoid the FSA's lien in a 1972 John Deere Model 4260 to the extent of $2,941.00 and (2) redeem the remaining value in the 1972 John Deere Model 4620 for $3,559.00. The parties have presented little if any information from which the Court could make a determination with regard to this request.

### VI. *ORDER*

IT IS THEREFORE ORDERED as follows:

1. Farmers Bank's and the FSA's Objection to Debtors Claimed Exemptions are DENIED.

2. Debtors' two Motions to Avoid Security Interest of the FSA and Farmers Bank in Exempt Property Under 11 U.S.C. § 522(f) are hereby GRANTED and the liens of FSA and Farmers Bank are avoided to the extent that such liens impair the Colorado exemption to which these Debtors are entitled. The Debtors' exemptions to which they are entitled un-

der CoLo.Rev.Stat. § 13–54–102(1)(g) and (1)(i) total $70,000.00.